## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff/Respondent,

v.                               Civ. No. 14-23 MCA/KK
                                    (Cr. No. 10-3352 MCA)

CARLOS ZAMUDIO-BELTRAN,

      Defendant/Petitioner.

## MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Defendant/Petitioner Carlos Zamudio-Beltran's ("Defendant") Motion Pursuant to 28 U.S.C. § 2255 ("Petition") to set aside his conviction and sentence, which he filed on January 8, 2014.  (Doc. 1.)  Plaintiff/Respondent the United States of America ("the Government") responded in opposition to the Petition on February 20, 2014.  (Doc. 4.)  Defendant filed a reply in support of the Petition on April 15, 2014.  (Doc. 11.)  Chief United States District Judge M. Christina Armijo referred this matter to the undersigned on September 22, 2014.  (Doc. 13.)

In November 2010, the Government charged Defendant with a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), *i.e.*, possession with intent to distribute one kilogram and more of heroin.  Defendant subsequently entered into a plea agreement, pled guilty, and was sentenced to 210 months of incarceration.  He now seeks to have his conviction and sentence set aside, arguing that his trial counsel provided him with ineffective assistance in:  (1) negotiating his plea agreement and concomitant appeal waiver; (2) failing to adequately investigate the case before advising him to enter a guilty plea; and, (3) failing to advise him of the specific immigration consequences of entering a guilty plea.  The Government responds that Defendant's counsel was

not ineffective, that counsel's alleged errors did not prejudice Defendant's defense, and that the appellate waiver in Defendant's plea agreement bars some of his collateral attacks on his conviction and sentence.  The Government submitted the affidavit of Defendant's trial counsel, David Serna, in support of its arguments.

The Court has meticulously reviewed all of the pleadings and attachments in this civil proceeding and in the underlying criminal case, Cr. No. 10-3352 MCA.  The Court has also examined the transcripts of the plea hearing before then-Chief United States Magistrate Judge Lorenzo Garcia (CR Doc. 56)[1] and the sentence proceedings before then-Chief United States District Judge Bruce D. Black (CR Docs. 52, 53), as well as portions of the Presentence Investigation Report ("PSR").[2]  Because the Petition, exhibits, and record conclusively establish that Defendant is not entitled to relief, an evidentiary hearing is unnecessary.  28 U.S.C. § 2255(b); *United States v. Flood*, 713 F.3d 1281, 1291 (10th Cir. 2013); *United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000).  Having carefully considered the parties' submissions, the civil and criminal record, and the relevant law, the Court recommends that Defendant's Petition be DISMISSED with prejudice.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 18, 2010, the Government charged Defendant via criminal complaint with possession with intent to distribute one kilogram and more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).  (CR Doc. 1.)  Also on November 18, 2010, the Court appointed Assistant Federal Public Defender John Butcher to represent Defendant.  (CR Doc. 4.)  The next day, the Court ordered Defendant to be detained

---

[1] References to "CR Doc." are to the docket in Cr. No. 10-3352 MCA (D.N.M.), the underlying criminal case.

[2] As a matter of practice, PSRs are not filed of record in this district.  Here, however, the Government filed a portion of the PSR in a sealed Appendix to the Government's Response to Defendant's Petition.  (Doc. 5-4 at 1-3.)

pending trial.  (CR Docs. 7, 8.)  Attorney David Serna entered his appearance as Defendant's retained counsel on November 30, 2010, whereupon the Court entered an Order withdrawing Mr. Butcher as defense counsel.  (CR Docs. 9, 11.)  On December 15, 2010, a grand jury returned a one-count indictment charging Defendant with possession with intent to distribute one kilogram and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). (CR Doc. 14.)  Defendant pled not guilty to the charge at his arraignment on December 21, 2010.  (CR Doc. 16.)

On June 27, 2011, following a series of continuances granted at Defendant's request, Defendant consented to plead guilty in a felony case before a magistrate judge (CR Doc. 35), and pled guilty to the offense charged in the indictment pursuant to a plea agreement. (CR Docs. 34, 36, 56.)  In the plea agreement, Defendant acknowledged that he was in fact guilty of the charged offense, that he recognized and accepted responsibility for his criminal conduct, and that, should he elect to proceed to trial, the Government could prove facts sufficient to establish each element of the crime of possession with intent to distribute one kilogram and more of heroin beyond a reasonable doubt.  (CR Doc. 36 at 3-4.)  Defendant specifically admitted the following facts, which he declared under penalty of perjury to be true and correct:

> On November 17, 2010, Albuquerque Drug Enforcement Administration (DEA) Agents with the assistance of Bernalillo County Sheriff's Office (BCSO) Deputies, served a Federal Search Warrant signed by U.S. Magistrate Judge Robert Hayes Scott at 3509 Pimlico SW, Albuquerque, NM.  Carlos Nohe Zamudio-Beltran, his wife . . . , and three small children . . . were found in the master bedroom sleeping when agents entered the residence.
>
> DEA SA Jeff Armijo located a large sum of U.S. currency in the master bedroom closet of the residence.  SA Armijo also located a large sum of U.S. currency in a dark blue Yukon Denali . . . which was parked in the driveway of the residence.

BCSO Deputy Chris Romero located a large sum of U.S. currency and approximately 3.05 gross kilograms of suspected heroin in the trunk of a dark blue Honda Accord . . . which was parked in the garage of the residence.

SA Carlos Bernal-Vega as witnessed by SA Armijo, read Carlos Nohe Zamudio-Beltran his rights per *Miranda* in Spanish.  Zamudio-Beltran then stated to SA Bernal-Vega that all of the money and all of the drugs found in the residence belonged to him.

Items seized from the residence and vehicles on November 17, 2010, included $161,437 in [U.S.] currency, approximately 12 kilograms of cutting agent, approximately 3 gross kilograms of heroin, a small quantity of cocaine, digital scales and a money counter.  At a trial on the merits, a DEA Forensic Chemist would testify that the narcotics seized on November 17, 2010, included 2958 net grams of heroin and 25.6 net grams of cocaine.

(*Id.* at 3-4.)  Defendant agreed "that the Court may rely on any of these facts . . . to determine the Defendant's sentence."  (*Id.* at 4.)

In his plea agreement, Defendant affirmed that he understood the minimum and maximum sentence the Court could impose to be a term of imprisonment of not less than ten (10) years nor more than life.   (*Id.* at 2).  Defendant also acknowledged that, although the federal sentencing guidelines are advisory, the Court is required to consider them in determining his sentence.  (*Id.* at 3.)  To that end, Defendant and the Government entered into the following non-binding stipulations pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

a.      At least three kilograms of heroin but less than 10 kilograms of heroin are attributable to the Defendant.  Accordingly, the parties agree that the Defendant's base offense level under the sentencing guidelines is 34, pursuant to [United States Sentencing Guidelines] § 2D1.1(c)(3).

b.      . . . [P]ursuant to U.S.S.G. § 3E1.1, so long as the Defendant continues to accept responsibility for the Defendant's criminal conduct, the Defendant is entitled to a reduction of three levels from the base offense level as calculated under the sentencing guidelines. . . .

c.      The parties agree to a sentence at the low end of the applicable guideline range.

> d.    The Defendant recognizes that this plea agreement has already conferred a benefit on the Defendant.  Consequently, in return for the benefit conferred on the Defendant by entering into this agreement, the Defendant agrees not to seek a downward departure or variance from the applicable sentencing guideline range as determined by the Court after the Court resolves any objections by either party to the presentence report.  In other words, the Defendant agrees that a sentence within the applicable guideline range is a reasonable sentence.

(*Id.* at 4-6.)  However, apart from these stipulations, Defendant reserved the right to "assert any . . . argument with respect to the sentence to be imposed," including regarding the applicability of U.S.S.G. §§ 2D1.1(b)(1) and 5C1.2 and 18 U.S.C. § 3553(f).  (*Id.* at 7.)  In the plea agreement, Defendant acknowledged that, regardless of any stipulations, his sentence was solely within the Court's discretion after it reviewed the PSR, that the Court could accept or reject any one or more of the stipulations, and that the Court had the discretion to depart from the advisory guideline sentence.  (*Id.*)

The plea agreement also addressed the immigration consequences of Defendant's plea, stating:

> Defendant recognizes that pleading guilty may have consequences with respect to Defendant's immigration status if Defendant is not a citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which Defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and Defendant understands that no one, including Defendant's attorney or the district court, can predict to a certainty the effect of Defendant's conviction on Defendant's immigration status.  Defendant nevertheless affirms that Defendant wants to plead guilty regardless of any immigration consequences that Defendant's plea may entail, even if the consequence is Defendant's automatic removal from the United States.

(*Id.* at 9-10).  Significantly, in addition to this general acknowledgement, Defendant specifically and expressly consented to his removal from the United States upon his release from prison. Thus, the plea agreement states that

> [t]he Defendant consents to removal from the United States following the completion of Defendant's sentence.  Defendant further agrees to waive rights

relating to any and all forms of relief from removal or exclusion, to abandon any pending applications for such relief, and to cooperate with the Department of Homeland Security during removal proceedings.

(*Id.* at 10.)

Defendant's plea agreement also included a waiver of appellate rights, which states:

[t]he Defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a [d]efendant the right to appeal a conviction and the sentence imposed. Acknowledging that, the Defendant knowingly waives the right to appeal the Defendant's conviction(s) and any sentence and fine within or below the applicable advisory guideline range as determined by the Court. The Defendant specifically agrees not to appeal the Court's resolution of any contested sentencing factor in determining the advisory sentencing guideline range. In other words, the Defendant waives the right to appeal both the Defendant's conviction(s) and the right to appeal any sentence imposed in this case except to the extent, if any, that the Court may depart or vary upward from the advisory sentencing guideline range as determined by the Court. In addition, the Defendant agrees to waive any collateral attack to the Defendant's conviction(s) pursuant to 28 U.S.C. § 2255, except on the issue of counsel's ineffective assistance in negotiating or entering this plea or this waiver.

(*Id.*) Finally, Defendant agreed and represented that his

plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement). There have been no promises from anyone as to what sentence the Court will impose. The Defendant also represents that the Defendant is pleading guilty because the Defendant is in fact guilty.

(*Id.* at 11.)

On June 27, 2011, the Assistant United States Attorney, Defendant, and Defendant's counsel all signed the plea agreement. The following paragraph appears directly above Defendant's signature:

This Agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorney. I understand the terms of this Agreement and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this Agreement. No promises or inducements have been given to me other than those contained in this agreement. No one has

threatened or forced me in any way to enter into this Agreement.  Finally, I am satisfied with the representation of my attorney in this matter.

(*Id.* at 13.)  Mr. Serna, in turn, signed his name under the following paragraph:

> I am the attorney for CARLOS ZAMUDIO-BELTRAN.  I have carefully discussed every part of this Agreement with my client.  Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this Agreement.  To my knowledge, my client's decision to enter into this Agreement is an informed and voluntary one.

(*Id.*)

In his affidavit, Mr. Serna explained his recommendation that Defendant accept the foregoing plea agreement, attesting that

> [u]pon review of the discovery and in discussion about the discovery with Mr. Zamudio-Beltran, it became clear to me that the Government did have a strong case against Mr. Zamudio-Beltran.  The search was conducted pursuant to an initial search warrant.  Substantial additional drugs were located pursuant to a subsequent search warrant.  There did not appear [to be] grounds to challenge the adequacy of the application for any search warrant, or other search and seizure issues.  Additionally, Mr. Zamudio-Beltran affirmed to me that he had told law enforcement officers at the time of his arrest that all the money and all the drugs were his. . . .

> Mr. Zamudio-Beltran never professed his innocence to me and never indicated that he wanted to go to a jury trial.  In fact, Mr. Zamudio-Beltran consistently pressed me to obtain a plea bargain for him. . . .

> I do not know what substantive motions I could or should have filed prior to trial.  Mr. Zamudio-Beltran admitted that the drugs located in the house were his.

(Doc. 5-3 ¶¶ 3-5.)

Throughout his change of plea hearing before Judge Garcia on June 27, 2011, the Court's sworn Spanish-language interpreter provided simultaneous interpretive services to Defendant.  (CR Doc. 34; CR Doc. 56 at 2.)  Defendant swore to tell the truth at the hearing.  (CR Doc. 56 at 3.)  Judge Garcia advised Defendant of his presumption of innocence, his right to proceed to trial, and the rights that accompany a jury trial, (*id.* at 11-13), and asked Defendant his birth year,

7

where he was born, and the extent of his education.  (*Id.* at 5.)  Defendant answered that he was

born in Mexico in 1975, was a Mexican citizen, and had not had any schooling.[3]  (*Id.*)

Defendant denied being under the influence of any substances that would interfere with his

ability to understand the plea proceedings and indicated that he had never been treated for and to

his knowledge does not suffer from a mental illness, disability, or disorder.  (*Id.* at 5-6.)

Defendant indicated that he had had sufficient time to consult with Mr. Serna about his

decision to plead guilty, that Mr. Serna had carefully reviewed the entire plea agreement with

him and explained its provisions to him, that Mr. Serna had answered all of his questions to his

satisfaction, that he was satisfied with Mr. Serna's legal representation and advice, and that he

had no complaints about Mr. Serna or the quality of the legal representation he had received.  (*Id.*

at 6-8.)  Defendant affirmed to Judge Garcia that Mr. Serna had:  (1) told him what evidence the

Government would have to present and prove before he could be convicted of the charged

offense; (2) discussed with him defenses that may be available to him; and, (3) investigated the

charge by interviewing Defendant, reviewing and disclosing to him the Government's evidence

including witness statements and laboratory reports, and trying to find witness testimony or other

evidence that would be helpful to his defense if he proceeded to trial.  (*Id.* at 7.)

Of particular note, Judge Garcia informed Defendant

that any estimate of the sentence which may have been given you by Mr. Serna
represents his good judgment and good faith belief concerning the sentence, but
his estimate is still an estimate.  The sentence imposed by Judge Black may differ
from the estimate given you by Mr. Serna.  Do you understand that?

THE DEFENDANT:  Yes.  I do.

(CR Doc. 56 at 10-11.)  Judge Garcia also informed Defendant, and Defendant confirmed he

understood, that he would be giving up his right to appeal and collaterally attack his sentence and

---

[3] However, in his reply in support of the Petition, Defendant asserts that he received five (5) years of formal education in Mexico.  (Doc. 11 at 4.)

conviction, unless Mr. Serna was "constitutionally ineffective." (*Id.* at 13.) Finally, Judge

Garcia particularly informed Defendant that pleading guilty had

> other consequences. You will be deported to your homeland once you have
> served whatever penalty the Court orders you to serve. And in addition, sir, if at
> some time in the future you commit and are convicted of another felony,
> including the felony of unlawfully returning to the United States after deportation,
> the penalty for that felony will be enhanced or increased as a result of today's
> conviction. Do you understand that?
>
> THE DEFENDANT: Yes. I do.

(*Id.* at 10.) After a thorough plea colloquy, Defendant entered a plea of guilty to the crime

charged. (*Id.* at 14-15.) The Court accepted Defendant's plea, finding it to be "knowingly,

willingly and voluntarily made." (*Id.* at 15.) Before the hearing closed, Mr. Serna noted, and the

Court confirmed, that Defendant had reserved his right to "assert his position regarding the

correct application of Section [2D1.1] of the Sentencing Guidelines, Section [5C1.2] of the

Sentencing Guidelines and the application of 18 U.S.C. 3553(f)(1) through (5)." (*Id.* at 16-17.)

On December 6, 2011, Defendant filed Sealed Objections to the PSR. (CR Doc. 38.)

The Government filed a Sealed Response in opposition to these objections on December 19,

2011. (CR Doc. 39.) Judge Black began sentence proceedings on March 1, 2012, at which

Defendant was present and represented by Mr. Serna. (CR Doc. 52 at 2.) At the hearing, Mr.

Serna argued Defendant's theory of the case regarding sentencing. (*See generally id.*)

Specifically, Mr. Serna contended that Defendant was a minor participant in the drug trafficking

organization at issue, and that his sole role was to reside in the house where the organization

stored drugs, packaging materials, money, and a firearm. (*Id.* at 4, 8-10.) Mr. Serna asserted

that Defendant told law enforcement officers the drugs and money found in the residence were

his to prevent his children from being removed from his wife's custody. (*Id.* at 4-5.) Mr. Serna

argued that Defendant's cousin, Celido Zamudio-Beltran, actually owned the drugs and firearm

found in the house.  (*Id.* at 5.)  However, Mr. Serna acknowledged that he had contacted Celido

Zamudio-Beltran's attorney, who told him "that Celido did not want to take the blame for that."

(*Id.*)  Judge Black then observed that

> [Celido Zamudio-Beltran's] story was strikingly similar to your client's story,
> that he was just there having to share the residence, and your client is the
> mastermind.
>
> MR. SERNA:  I would expect that that's what he would say, Your Honor.

(*Id.*)  Mr. Serna also described the information Defendant provided to the Government at a

debriefing on February 28, 2011.  (*Id.* at 5-7.)

Because the Government disputed Defendant's position regarding his role in the drug

trafficking organization, Judge Black scheduled an evidentiary hearing for March 5, 2012.  (*Id.* at

12-15.)  At the hearing, Judge Black heard the testimony of two witnesses, Defendant and DEA

Agent Christopher Godier.  (CR Doc. 53 at 2, 32-33.)  The undersigned has thoroughly reviewed

the transcript of this hearing, which is of record, and will not describe all of its particulars here.

*Inter alia*, however, Defendant testified that:  (1) his name was on the lease agreement for the

residence where the drugs and money were found, and he paid the rent of $1,200 per month, but

with money belonging to Celido Zamudio-Beltran and Jesus Gonzalez Ramirez, also known as

"El Chino" (*id.* at 4, 9-10, 17, 29-30); (2) he did not own or exercise control over the heroin,

firearm, or money found at the residence (*id.* at 5-6, 9, 13, 30-31); (3) his supervisor in the drug

trafficking organization was his cousin, and his cousin's supervisor was "El Chino" (*id.* at 6-7);

(4) he supervised no one in the organization (*id.* at 6); (5) the funds for a bank deposit of $27,000

that he made were from his agricultural harvest in Mexico (*id.* at 10-11, 27); (6) his annual

income as a farmer was $9,000 (*id.* at 27); (7) he knew that, in the closet of the master bedroom

where he slept, there was an accordion file that contained the lease agreement for the residence

and the titles for the two vehicles parked there, as well as an assault rifle, boxes of U.S. currency, and a jacket containing cocaine for his personal use (*id.* at 3, 16-19); (8) he knew that a heat sealer, plastic baggies, a digital scale, and keys to the residence and one of the vehicles were in his master bedroom and bath (*id.* at 19-20); (9) he knew that keys to the other vehicle and fourteen pounds of "cut" were elsewhere in his residence (*id.* at 20-22); and, (10) he knew that about $160,000 in cash, about three (3) kilograms of heroin, and about four (4) kilograms of "cut" were in the vehicles parked at the residence.  (*Id.* at 25-26.)

Agent Godier, in turn, testified that Defendant's residence was "a nice place.  Nice home, custom front door, had nice furnishings, exercise room," and was "not consistent with what I would normally find in a stash house."  (*Id.* at 34.)  In contrast, he described the condition of a stash house in a related case[4] as "dirty" and "not a nice place," with mattresses on the floor, "no other real furniture," packaging material, and heroin hidden in a heating duct.  (*Id.* at 33.)  Agent Godier stated that he did not find Defendant's characterization of his role in the drug trafficking organization to be truthful, noting that Celido Zamudio-Beltran's version of events was inconsistent with Defendant's, that two confidential informants had named Defendant as a leader of the organization, that Agent Godier had found one of these informants to be "extremely reliable," and that what officers found at Defendant's residence was consistent with the information the informants had provided.  (*Id.* at 42-44.)

After the presentation of evidence, Judge Black found that Defendant "was the local leader, at least, of the organization," and that "the PSR is substantially correct on all counts." (*Id.* at 46.)  He specifically found Defendant's "minor role" theory "to be not credible, not [as to] the gun and the narcotics."  (*Id.* at 49-50.)  Also, counsel argued several other points relevant to

---

[4] The related case appears to be *United States v. Rosales-Sanchez*, Cr. No. 10-3353 BB (D.N.M.).

Defendant's sentencing, including whether Defendant possessed over three (3) kilograms of heroin, whether he possessed the firearm found at the residence, whether he had maintained a drug house, and whether he met the requirements for a reduction of his sentence pursuant to 18 U.S.C. § 3553(f).  (*Id.* at 46-51.)

At the conclusion of the hearing, Judge Black accepted Defendant's plea and found as follows:

> I have reviewed the [PSR] factual findings and considered the guidelines.  I've also considered the factors set forth in 18 United States Code, Section 3553, and find that none of them apply to the current situation.  The offense level is 37, the criminal history is category [I]; the guideline imprisonment range is, therefore, 210 to 262 months.  The Court notes the defendant was part of a large drug trafficking organization in Albuquerque.  He was the leader of the conspiracy, and present during the execution of the federal search warrant wherein a large amount of money and drugs . . . were seized in close proximity to where he was maintaining his sleeping quarters and using the restroom.

(*Id.* at 51-52.) Judge Black sentenced Defendant to a term of imprisonment of 210 months, and included, *inter alia*, the special condition that

> Defendant must not reenter the United States without legal authority.  You understand, Mr. Zamudio, if you are found in this country again, you'll immediately be placed in prison and likely for a long time.  You're aware of that?
>
> THE DEFENDANT:  Yes.

(*Id.* at 52.)

## II.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255, a federal prisoner who

> claim[s] the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).   Relief is available under Section 2255 only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (internal quotation marks and citation omitted).   The court must presume "that the proceedings leading to the conviction were correct"; the burden is on the petitioner to demonstrate otherwise.   *Klein v. United States*, 880 F.2d 250, 253 (10th Cir. 1989) (citing *United States v. Morgan*, 346 U.S. 502, 512 (1954)).

## III.   ANALYSIS

In his Petition, Defendant asserts that his trial counsel was ineffective in negotiating his guilty plea, including the appeal waiver in his plea agreement.   Defendant alleges five deficiencies in his counsel's performance:  (1) failure to adequately investigate Defendant's role in the offense pre-plea (Doc. 1 at 4, 6-9); (2) failure to file substantive pre-trial motions (*id.* at 2-3); (3) misrepresentation of the sentence Defendant would receive if he entered the plea (*id.* at 3); (4) failure to "negotiate away" the appeal waiver in the plea agreement (*id.* at 4); and, (5) failure to explain the immigration consequences Defendant faced if he entered the plea.  (*Id.* at 9-14.)  Defendant requests an evidentiary hearing at which he contends he "will present evidence that (1) his lawyer provided ineffective assistance of counsel in the negotiation of the plea . . . , and (2) but for this deficient performance, there is a reasonable likelihood that the outcome of these proceedings would have been different."  (*Id.* at 6, 13-14.)

As an initial matter, the Government urges the Court to decline to review some of Defendant's claims because they fall within the scope of his waiver of appellate rights.  (Doc. 4 at 5-14.)  Defendant counters that he has not waived his right to collateral review of the issues he has raised, and that the appellate waiver should not be enforced because his attorney was ineffective in negotiating the plea agreement and waiver.   (Doc. 11 at 1-9.)   Given the

importance of the plea process to the criminal justice system, federal courts generally enforce plea agreements and concomitant waivers of appellate rights "where the waiver is expressly stated in the plea agreement and where both the plea and the waiver were knowingly and voluntarily made." *United States v. Cockerham*, 237 F.3d 1179, 1183 (10th Cir. 2001); *see also United States v. Hahn,* 359 F.3d 1315, 1318 (10th Cir. 2004)*; United States v. Hernandez,* 134 F.3d 1435, 1437 (10th Cir. 1998).[5]  However, in the present matter, the Court need not consider whether Defendant's claims fall outside the scope of the appeal waiver, and whether the waiver is unenforceable, because even if Defendant had not waived his right to collaterally attack his conviction and sentence—a question the Court does not reach—his claims fail on their merits.

The Sixth Amendment right to effective counsel extends to the plea process. *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010).  For a petitioner to succeed on a claim of ineffective assistance of counsel, he must demonstrate both that:  (1) "counsel's representation fell below an objective standard of reasonableness"; and, (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *see also Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985) (applying *Strickland* to plea process).  Where a petitioner has pled guilty in the underlying criminal case, to prevail in his collateral attack he must show both that:  (1) his attorney's performance fell outside "the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson,* 397 U.S. 759, 771 (1970); and, (2) he was prejudiced because "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at 59.  In applying the *Strickland* test to ineffective assistance of counsel claims, the Court "may address the performance and

---

[5] "We do so, in large part, because public policy strongly supports such waivers as they benefit defendants, the government, and society at large." *Hahn*, 359 F.3d at 1318 (citing *United States v. Elliott,* 264 F.3d 1171, 1174 (10th Cir. 2001)).

prejudice components in any order, but need not address both if [the defendant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.   A court's review of counsel's performance is "highly deferential," *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011), and a defendant must overcome the strong presumption that his counsel rendered adequate assistance, and "made all significant decisions in the exercise of reasonable professional judgment."   *Strickland*, 466 U.S. at 689-90 (on habeas review, court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," which defendant must overcome).

Although a petitioner need not show that he would have prevailed at trial to demonstrate prejudice under *Strickland*, his prospects of succeeding inform the Court's view of whether he would have rejected a plea and gone to trial.   *United States v. Clingman*, 288 F.3d 1183, 1186 (10th Cir. 2002).

> A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.

*United States v. Broce*, 488 U.S. 563, 569 (1989).   "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"   *Hill*, 474 U.S. at 56 (quoting *North*

*Carolina v. Alford*, 400 U.S. 25, 31 (1970)).   The Court will examine each of the alleged deficiencies in Defendant's trial counsel's performance in light of the foregoing standards.

A.   *Defendant's counsel did not provide ineffective assistance in conducting his pre-plea investigation of the case.*

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 691.  In ineffective assistance of counsel cases challenging convictions based on a guilty plea,

> where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.

*Hill*, 474 U.S. at 59.  This assessment "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial."  *Id.*  "[T]hese predictions of the outcome at a possible trial . . . should be made objectively, without regard for the idiosyncrasies of the particular decisionmaker."  *Id.* at 59-60 (internal quotation marks and citation omitted).

Defendant argues that his trial counsel was ineffective because counsel failed to properly investigate the strengths and weaknesses of the Government's case before advising him to enter a guilty plea.  (Doc. 1 at 6.)  Defendant asserts that "there is a reasonable likelihood that if [his] trial counsel had conducted a proper pre-trial investigation to test the Government's case, the plea would have taken a very different shape, or [he] would have rejected a plea and insisted on a trial."  (*Id.* at 8-9.)  Specifically, Defendant contends that his counsel failed to adequately

investigate his claims that he was a minor player in the conspiracy at issue, that his cousin Celido Zamudio-Beltran was actually his boss, not the other way around as the Government believed, and that the actual leader of the organization was "El Chino." (*Id.* at 6-7.) Defendant asserts that, "[h]ad a pre-plea investigation been properly conducted, [Defendant] would have been able to show that he did not have a leader/organizer[6] role in the conspiracy, entitling him to a reduced sentence." (*Id.* at 7.) According to Defendant, even the author of the PSR was unsure who the organization's actual leader/organizer was, and that "[t]hese . . . sorts of weaknesses in the Government's case . . . should have been the basis of a thorough pre-trial, independent investigation" by defense counsel, "should have been brought to the attention of the Court in pre-trial motions of various sorts," and "should have been ammunition in plea negotiations that could have protected Mr. Zamudio from a sentence of 210 months." (*Id.* at 7-8.)

The actual facts of the case belie these arguments. First, Mr. Serna plainly *did* conduct a reasonable pre-plea investigation of Defendant's claims regarding his role in the drug trafficking organization. (Doc. 5-3 ¶¶ 5-7.) "[O]n numerous occasions, [Mr. Serna] asked [Defendant] for the names of any people who could demonstrate that he was a minor player in this case." (*Id.* ¶ 6.) In response, Defendant identified only Celido Zamudio-Beltran. (*Id.*) Because Celido Zamudio-Beltran was a defendant in a related case and represented by counsel, Mr. Serna could not ethically speak to him directly to determine whether he would corroborate Defendant's claims. (*See* CR Doc. 18.) Instead, Mr. Serna approached Celido Zamudio Beltran's first attorney, Erlinda Johnson,[7] and later his second attorney, Edward Bustamante. (Doc. 5-3 ¶ 6.)

---

[6] The Court increased Defendant's offense level by two for his role in the drug trafficking organization. (CR Doc. 53 at 51-52; Doc. 4 at 16-17; Doc. 5-4 at 1.) This was the lowest permissible increase for a defendant who led, organized, managed, or supervised a criminal activity. U.S.S.G. § 3B1.1.

[7] Ms. Johnson was later permitted to withdraw her representation of Celido Zamudio-Beltran based on a conflict of interest. *See United States v. Celido Zamudio-Beltran*, Cr. No. 10-3350 BB (D.N.M.), (Docs. 21, 24). The record

However, "it became very clear that [Defendant's] reliance on Celido for testimonial assistance was misplaced." (*Id.*) Indeed, "Celido Zamudio-Beltran refused to help [Defendant] in any way and refused to confirm [Defendant's] version of events." (*Id.*) Mr. Serna's representations in this regard are corroborated by Judge Black's statement at Defendant's sentencing hearing that Celido Zamudio-Beltran's "story" was "that he was just there having to share the residence, and that [Defendant] is the mastermind." (CR Doc. 52 at 5.)

The objective evidence also contradicts Defendant's claim that he played a minor role in the drug trafficking organization. Defendant lived in a "nice," well-furnished home with a custom door and an exercise room. (CR Doc. 53 at 34.) In contrast, other individuals involved in the organization resided in a typical "stash house," *i.e.*, a dirty home with "no real furniture." (*Id.* at 33-34.) Defendant's home was leased in his and his wife's names, and Defendant paid the rent, although he claims he did so with others' money. (*Id.* at 9-10, 17.) At the time of his arrest, Defendant was found in possession of, *inter alia*, a large quantity of U.S. currency, an assault rifle, about 18 pounds of cutting agent, a heat sealer, packaging material, a digital scale, and the titles and keys to two vehicles, including a Honda Accord containing about $490,000 in U.S. currency, about six kilograms of heroin, and a quantity of methamphetamine. (CR Doc. 36 at 3-4, 8-9; CR Doc. 52 at 12-13; CR Doc. 53 at 16-23, 25-26.)

Both Mr. Serna and Defendant presented Defendant's claims about his role in the offense to the Government during pre-plea negotiations and a debriefing with the prosecutor and case agents. (Doc. 5-3 ¶¶ 7-8.) However, the Government did not believe Defendant was being truthful, and as a result declined to support a safety-valve reduction. (*Id.*; CR Doc. 52 at 10-13.)

---

does not reflect what the conflict of interest was; however, Ms. Johnson also represented Defendant's brother Jesus Zamudio-Beltran in *United States v. Jesus Zamudio-Beltran*, Cr. No. 09-492 WJ (D.N.M.); and, Jesus Zamudio-Beltran's criminal complaint in that case was found in the accordion file in Defendant's master bedroom closet described in Section I, *supra*. (CR Doc. 53 at 16-17.) Also, Ms. Johnson recently entered her appearance on Defendant's behalf in the underlying criminal case and has filed a motion for sentence reduction. (CR Docs. 68-70.)

That the Government was presented with Defendant's claims pre-plea and found them to be incredible in light of all the evidence demonstrates the fallacy of Defendant's claim that he would have been offered a more favorable plea had Mr. Serna conducted additional pre-plea investigation.  Importantly, Defendant has identified absolutely no evidence that Mr. Serna could have but failed to uncover before Defendant entered into the plea agreement, that would have demonstrated that he played a lesser role in the offense.  *Clingman*, 288 F.3d at 1187 (dismissing appeal where, *inter alia*, "defendant's habeas counsel failed to articulate a single specific fact to support the alleged defense in the briefs he submitted").

The outcome of the evidentiary hearing Judge Black held before sentencing reinforces the conclusion that additional pre-plea investigation by Mr. Serna would have availed Defendant nothing.  At the hearing, Defendant testified to the information that he claims Mr. Serna failed to investigate, *i.e.*, that he played a minor role in the drug trafficking organization and that his cousin and "El Chino" were his bosses and owned the incriminating items found at his residence. (CR Doc. 53 at 5-10, 13.)  Based on the totality of the evidence presented, Judge Black found Defendant's testimony not to be credible.  (*Id.* at 49-50.)  For all of the above reasons, applying "a heavy measure of deference to counsel's judgments," and viewing his investigative decisions in light of the circumstances presented, the Court proposes to find that Mr. Serna conducted a pre-plea investigation well within the range of competence demanded of criminal defense attorneys.  *Strickland*, 466 U.S. at 691; *McMann*, 397 U.S. at 771.  Any decision not to conduct further investigation was entirely reasonable under the circumstances.

In addition, Defendant has failed to show a reasonable probability that, but for his counsel's failure to conduct a more thorough pre-plea investigation, the result of the proceedings would have been different.  *Strickland*, 466 U.S. at 694.  Defendant has made vague allusions to

"weaknesses" in the Government's case, but, as noted above, has failed to point to any actual evidence that Mr. Serna could have but failed to discover that would have shown that he played a lesser role in the offense.  (Doc. 1 at 4.)  He has failed to identify any witnesses that Mr. Serna should have interviewed, any documents or physical evidence he should have inspected, or any other evidence Mr. Serna did not pursue that would have supported Defendant's theory of the case at sentencing.  In the absence of such a showing, the Court proposes to find that Defendant has plainly failed to meet his burden under *Strickland* to demonstrate either that his trial counsel conducted a deficient investigation, or that any alleged deficiencies prejudiced his defense. *Strickland*, 466 U.S. at 687-88.  The Court therefore recommends that Defendant's claims based on his trial counsel's pre-plea investigation be dismissed.

B.    *Defendant's counsel did not provide ineffective assistance in failing to file substantive pre-trial motions.*

Defendant next claims that his trial counsel provided him with ineffective assistance because counsel filed no motions in the case, except continuance motions and objections to the PSR.  (Doc. 1 at 2-3, 8.)  However, Defendant has utterly failed to show either that his counsel's failure to file substantive pre-trial motions fell outside the range of competence demanded of criminal defense attorneys, or that this failure prejudiced his defense in any way.  *Strickland*, 466 U.S. at 687; *McMann*, 397 U.S. at 771.  Indeed, Defendant never even indicates what kinds of motions he claims his counsel ought to have filed, merely referring vaguely to "pre-trial motions of various sorts."  (Doc. 1 at 8.)  This is consistent with Mr. Serna's testimony that he knew of no "substantive motions [he] could or should have filed prior to trial," particularly in light of the facts that officers found large amounts of drugs and U.S. currency in Defendant's home pursuant to valid search warrants, and Defendant admitted, following *Miranda* warnings in Spanish, that the drugs and money were his.  (Doc. 5-3 ¶¶ 3, 5.)  Nor does Defendant ever explain how "pre-

20

trial motions of various sorts" would have had any likelihood of changing the outcome of the case. In these circumstances, it is plain that Defendant's trial counsel did not render ineffective assistance in failing to file substantive pre-trial motions, that this failure did not prejudice Defendant's defense, and that Defendant's claims on this basis should be dismissed.

C.   *Defendant's counsel did not provide ineffective assistance in advising Defendant of the sentence he would receive if he pled guilty.*

Defendant next claims that defense counsel misrepresented the length of the sentence he would receive if he pled guilty. (Doc. 1 at 3.) Specifically, Defendant contends that counsel told him he would be exposed to a sentence of "ten years or lower." (*Id.*) However, Defendant's sworn statements at the plea colloquy, and his signed plea agreement, directly contradict this contention. The plea agreement explicitly states that Defendant understood the minimum and maximum sentence the Court could impose to be a term of imprisonment of not less than ten (10) years nor more than life. (CR Doc. 36 at 2.) Moreover, in the agreement, Defendant expressly acknowledged that his final sentence was solely within the Court's discretion after it reviewed the PSR; that the Court could accept or reject any stipulations regarding sentencing; and, that the Court had the discretion to depart from the advisory guideline sentence. (*Id.* at 7.) Defendant also acknowledged that "[t]here have been no promises from anyone as to what sentence the Court will impose." (*Id.* at 11.)

Likewise, at Defendant's plea hearing, Judge Garcia specifically informed Defendant that he faced a minimum term of ten (10) years to a maximum term of life imprisonment if he pled guilty. (CR Doc. 56 at 9-10.) Judge Garcia asked Defendant if he understood the penalties he was facing, and whether his attorney had "reviewed with [him] carefully the entire [p]lea agreement" and "explain[ed] its various provisions to [him]." (*Id.* at 6.) Defendant answered "yes" to these questions. (*Id.*; *see also* Doc. 5-3 ¶ 11 (Mr. Serna "went over every line [of the

plea agreement] with [Defendant] and ascertained that he understood all of it.").)  The Court confirmed that counsel had explained the sentencing guidelines and their potential application to Defendant, and informed Defendant that "[t]he sentence imposed by Judge Black may differ from the estimate given [him] by Mr. Serna" and that he would not able to withdraw his plea even if Judge Black imposed a penalty more severe than he anticipated.  (CR Doc. 56 at 9-11.) Defendant affirmed under oath that he understood this information.  (*Id.*)  At no point during the hearing did Defendant claim that his attorney had misadvised him as to the sentence he would receive, despite ample opportunity to do so.  (*See generally id.*)

        "Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."  *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  The "truth and accuracy" of a defendant's statements during the plea hearing "should be regarded as conclusive in the absence of a believable, valid reason justifying a departure from the apparent truth of his Rule 11 statements."  *Hedman v. United States*, 527 F.2d 20, 22 (10th Cir. 1975); *United States v. Estrada*, 849 F.2d 1304, 1306 (10th Cir. 1988) ("A defendant's statements at a plea hearing should be regarded as conclusive . . . in the absence of a believable, valid reason justifying departure from the apparent truth of those statements." (internal quotation marks omitted)).

        On the record before the Court, it is beyond dispute that Defendant was fully advised of the consequences of pleading guilty, including that he would receive a term of imprisonment of not less than ten (10) years nor more than life, before he entered his guilty plea.  Defendant's *ex post facto*, self-serving statements that his trial counsel misled him about the length of the sentence he would receive are

> mere denials of that which he has previously admitted, [and] do[] not raise a
> substantial issue of fact within the meaning of § 2255.  Although an allegation of
> fact must ordinarily be accepted as true, it is not required where, as here, the
> allegation is contradicted by the files and records before the court.

*Runge v. United States*, 427 F.2d 122, 126 (10th Cir. 1970).  Apart from the bare allegations in

his Petition, there is no indication in the record that Defendant's plea was anything other than

knowing and voluntary.[8]  As such, the Court proposes to find that Defendant's trial counsel did

not provide ineffective assistance by misrepresenting the length of the sentence Defendant faced

if he pled guilty.  *See also United States v. Gordon*, 4 F.3d 1567, 1570 (10th Cir. 1993) ("A

miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally

deficient performance rising to the level of ineffective assistance of counsel.").

The Court further proposes to find that, even if counsel had misestimated Defendant's

potential sentence pre-plea, Defendant has failed to show "a reasonable probability that, but for

counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

*Hill,* 474 U.S. at 59.  As noted above, although a defendant does not need to show that he would

have prevailed at trial, his prospects of succeeding inform the Court's view of whether he would

have rejected the plea and gone to trial.  *Clingman*, 288 F.3d at 1186.  Here, had Defendant gone

to trial, his conviction was all but certain.  As Mr. Serna temperately observed, the Government

had a "strong case" against Defendant, which included much concrete objective evidence and his

own admission of guilt.  (Doc. 5-3 ¶ 3.)  Mr. Serna further attests that Defendant "never

---

[8] Defendant makes the general argument that his plea was not knowing and voluntary because the Court used "awfully big words for a fifth-grader" at his plea hearing.  (Doc. 11 at 5.)  There are at least two problems with this argument.  First, despite having had only five (5) years of formal education (*id.* at 4), Defendant was not a "fifth-grader," *i.e.*, a child of ten or eleven years.  Rather, he was a grown man of about thirty-six years, who had in the course of his life engaged in many adult transactions, such as raising three young children, farming, and crossing the United States-Mexican border multiple times, to say nothing of participating in a drug trafficking organization.  (CR Doc. 53 at 4, 10-11, 14-15, 27; CR Doc. 56 at 5.)  Second, at the plea hearing, Defendant had the assistance of counsel and of a sworn interpreter.  (CR Doc. 56 at 1-2, 6-8.)  In these circumstances, Defendant's limited education, and the Court's moderate use of legal terminology at his plea hearing, did not render his plea unknowing or involuntary.

professed his innocence to me and never indicated that he wanted to go to a jury trial.  In fact, [Defendant] consistently pressed me to obtain a plea bargain for him." (*Id.* ¶ 4.)  Then, had Defendant gone to trial and been convicted, he would have been sentenced to a mandatory term of life imprisonment, a sentence considerably longer than the 210 months he received by pleading guilty. (Doc. 5-4 at 3.)  In these circumstances, the Court proposes to find it incredible that, but for counsel's alleged misrepresentation of his potential sentence, Defendant would have rejected the plea and gone to trial.  *See also United States v. Viera*, 674 F.3d 1214, 1220 (10th Cir. 2012) ("[A]n erroneous sentencing prediction is not prejudicial where the court has conducted an adequate Rule 11 colloquy.").

Defendant seems to suggest that his counsel's request for a much lower sentence than he ultimately received is somehow indicative of counsel's ineffective assistance. (Doc. 1 at 3, 8.)  However, setting aside a guilty plea simply because the district judge rejected a defense counsel's sentencing request would completely undermine the Court's and the parties' fundamental interest in the finality of guilty pleas, and would turn habeas review on its head.

> Every inroad on the concept of finality undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice.  The impact is greatest when new grounds for setting aside guilty pleas are approved because the vast majority of criminal convictions result from such pleas.  Moreover, the concern that unfair procedures may have resulted in the conviction of an innocent defendant is only rarely raised by a petition to set aside a guilty plea.

*United States v. Timmreck*, 441 U.S. 780, 784 (1979).  For these reasons, the Court proposes to find that Defendant is plainly not entitled to relief based on his claim that his trial counsel misrepresented the sentence he would receive if he pled guilty, and recommends dismissal of these claims.

24

D.    *Defendant's counsel did not provide ineffective assistance in failing to "negotiate away" the appellate waiver in his plea agreement.*

Defendant next argues that it was not in his best interest for his counsel to "waive the opportunity to litigate . . . sentencing factors at the appellate level, where full briefing and oral argument, in addition to review by a panel of three appellate judges and their law clerks, would have provided a meaningful chance for [Defendant] to contest these sentencing factors and potentially reduce his sentence significantly."[9]   (Doc. 1 at 6.)   However, the Court proposes to find that counsel's assistance in negotiating Defendant's plea agreement, including the appellate waiver, was plainly within the range of competence demanded of attorneys in criminal cases. *McMann*, 397 U.S. at 771.

Trial counsel negotiated a very favorable plea agreement for Defendant.   The plea agreement prevented Defendant from being charged with possessing the assault rifle found in his bedroom closet in violation of 18 U.S.C. § 924(c).   The Government has made clear that, had the plea agreement not been negotiated, it would have sought to add a Section 924(c) charge, subjecting Defendant on conviction to an additional five (5) years of imprisonment. (Doc. 4 at 13-14; Doc. 5-3 ¶ 8); 18 U.S.C. § 924(c)(1)(A)(i).   In addition, had he not entered into the plea agreement, Defendant would have lost the benefit of stipulations to an offense level of 34 and a three-level reduction for acceptance of responsibility.[10]   (*See* CR Doc. 36 at 5.)   Thus, as the PSR noted, "[i]f the defendant had been convicted at trial . . . [h]is total offense level would have been

---

[9] Specifically, Defendant claims it would have been in his "best interest to retain the ability to appeal the district court's adverse decisions" regarding:  (1) a two-level enhancement for possession of a dangerous weapon under U.S.S.G. § 2D.1.1; (2) the calculation of drug quantity to include cocaine that Defendant claimed was for his personal use; (3) a two-level enhancement for maintaining a premises for distribution of a controlled substance under U.S.S.C. § 2D1.1(b)(12); (4) a two-level manager/supervisor enhancement under U.S.S.G. § 3B1.1(c); and, (5) failure to award a safety-valve departure under U.S.S.G. §§ 2D1.1(b)(16) and 5C1.2(1)-(5).  (Doc. 1 at 4-5).

[10] Given his testimony at sentencing, in which he minimized his role in the organization and denied ownership of the firearm and narcotics, which the Court disbelieved, Defendant arguably could have been denied a full three-point reduction for acceptance of responsibility, or even received an enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

44[, and a] total offense level of 44, combined with a criminal history category I, would have resulted in [a] lifetime term of imprisonment." (Doc. 5-4 at 3.) Also, the plea agreement preserved Defendant's ability to present evidence regarding several disputed issues at sentencing. (CR Doc. 36 at 7; Doc. 5-3 ¶ 8.) Thus, the plea agreement Mr. Serna negotiated conferred significant benefits on Defendant.

As to Defendant's argument that Mr. Serna should have "negotiated away" the appellate waiver in the plea agreement, the Government has been clear that it would have never offered him a plea agreement without it. (Doc. 4 at 14 ("At no time was the United States willing to enter into an agreement wherein there was no waiver of appeal rights."); Doc. 5-3 ¶ 9 ("The prosecutor was never willing to negotiate away the [appeal] waiver contained in [Defendant's] plea agreement.").) Then, it is highly unlikely that Defendant would have gone to trial and been acquitted, or, if convicted, would have received a lesser sentence than he actually received under the plea agreement. In these circumstances, Mr. Serna's strategic recommendation that Defendant accept the appellate waiver to get the benefit of the plea agreement is "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91; *United States v. Rodriguez-Rivera*, 518 F.3d 1208, 1216-17 (10th Cir. 2008) (no ineffective assistance where counsel negotiated a plea agreement with an appellate waiver from which defendant received "some benefit"). The Court therefore proposes to find that Defendant's trial counsel did not render ineffective assistance of counsel in failing to "negotiate away" the appellate waiver in the plea agreement, and recommends dismissal of Defendant's claims to the contrary.

E.   *Defendant's counsel was not ineffective in advising Defendant of the immigration consequences of his guilty plea.*

Defendant's last argument is that his trial counsel was ineffective because he failed "to provide specific advice . . . regarding the immigration consequences of pleading guilty." (Doc. 1

at 9.)  Specifically, Defendant asserts that his counsel "failed to ascertain" his immigration status, "failed to determine the specific effect" of Defendant's plea on that status, and failed to provide Defendant with "specific and direct advice as to the immigration consequences of pleading guilty to the [charged] offense."   (*Id.* at 9-10).   These alleged failures, according to Defendant, prevented him from being "fully aware of the consequences of pleading guilty."   (*Id.* at 10.) Defendant further argues that, but for these alleged errors, "there is a reasonable likelihood the outcome of these proceedings would have been different insofar as [Defendant] would have chosen to compel the Government to prove its case rather than submit to deportation from the United States." (*Id.* at 13-14.)

The Court proposes to find entirely incredible Defendant's allegations that Mr. Serna failed to ascertain his immigration status, determine the plea's effect on that status, and advise him of that effect.  Initially, Defendant's assertion that "the plea agreement contained nothing more than a vague and non-specific statement regarding immigration consequences" is patently false, and completely ignores the section of the agreement in which Defendant actually consented to his removal from the United States after completion of his sentence.  (*Id.* at 10; CR Doc. 36 at 10.)  Further, at the plea hearing, Judge Garcia affirmatively told Defendant that he would be deported after serving his sentence, and Defendant testified that he understood.  (CR Doc. 56 at 10.)  Moreover, Mr. Serna has attested that he "specifically told [Defendant] that he would be removed from the United States at the completion of his sentence and that he would be excluded from reentry into the United States for the remainder of his life."  (Doc. 5-3 ¶ 12.)  In short, Defendant's *ex post facto*, self-serving allegation that he was not advised of the immigration

consequences of his plea is completely unbelievable given the fact that he expressly agreed to be deported both in his plea agreement and at the plea hearing.[11]

In addition, the Court proposes to find that any deficiency in Mr. Serna's advice regarding immigration consequences in no way prejudiced Defendant. Establishing prejudice under *Strickland* in the context of a claim that defense counsel failed to advise the defendant that his guilty plea would result in deportation requires the defendant to demonstrate a reasonable probability that, "but for counsel's unprofessional errors, . . . the outcome of the plea process would have been different." *Lafler v. Cooper*, — U.S. —, 132 S. Ct. 1376, 1384 (2012). Here, Defendant has failed to show that, if he had known of the immigration consequences of his plea, there is a reasonable probability that he would have rejected the plea and proceeded to trial. *See United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) ("[W]hen a defendant who has pleaded guilty brings an ineffective-assistance claim, he must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.") (citation and internal quotation marks omitted).

It is completely improbable that Defendant would have chosen to face trial rather than accept deportation as part of his guilty plea, when he explicitly consented to deportation both in his plea agreement and at the plea hearing.[12] *Viera*, 674 F.3d at 1219-20 (denying certificate of appealability where habeas petitioner failed to show "that, absent counsel's alleged failure to advise him that he would be deported, he would have gone to trial"). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691; *see also Hill*,

---

[11] Also, at sentencing, Defendant stood silent when the Court recommended that the deportation process begin while Defendant was serving his sentence. (CR Doc. 53 at 52-53.)

[12] Notably, the PSR states that Defendant planned to "return to Mexico and work as a farmer and fisherman" upon his release from prison; and, Defendant did not object to this statement. (Doc. 5-4 at 2; *see generally* CR Doc. 38.)

474 U.S. at 57-58 ("[J]ustifications for imposing 'prejudice' requirement . . . are also relevant in the context of guilty pleas."). Defendant's claims based on his trial counsel's advice regarding the immigration consequences of his guilty plea should be summarily dismissed because he has conclusively failed to satisfy either prong of the *Strickland* test as to these claims.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court proposes to find that the Petition, exhibits, and record conclusively establish that Defendant is not entitled to the relief he seeks. Consequently, the undersigned recommends that the Court DISMISS the Petition (Doc. 1) and this case with prejudice.

_Kirtan Khalsa_
_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**